UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION |
| | ) | |
| DONOVAN BOSTICK | ) | NO. 06-21-08 (RBW) |
| | ) | |

**DEFENDANT BOSTICK'S SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION TO DISMISS ON SPEEDY TRIAL GROUNDS**

NOW COMES defendant DONOVAN BOSTICK, by and through undersigned counsel,

and files this supplemental brief in support of his adopted motion to dismiss the superseding

indictment, due to various speedy trial violations.

## INTRODUCTION

This Court is understandably reluctant to dismiss any case on speedy trial grounds.  As

one D.C. Circuit Judge lamented in _United States v. Brown_, 520 F.2d 1106 (D.C. Cir. 1975),

"Speedy trial issues are among the most unsatisfactory of those which … courts are called upon

to determine." _Id._ at 1118 (McGowen, J., concurring).  But the requirements of the law – and the

guarantees enshrined in our constitution – must be followed, and judges must make such difficult

decisions when the law requires.

Beyond the law, however, it should be noted here that Mr. Bostick did not have to face

this situation.  Beyond the long trial delays in this case are the original charging decisions the

Government made.   Yes, the Government is correct that there are videotapes of Mr. Bostick's

three (small) drug sales.  But the Government did not simply decide to indict Mr. Bostick based

on those transactions alone (now contained in Counts 110-115), which would have classified him

as a young, low-level player. The three videotaped transactions involved payments of $100, $100, and then $200, respectively, for the drugs. The drug quantities that cooperating witnesses purchased with this money were quite small – less than the weight of one penny on each such occasion. If Mr. Bostick had faced only substantive counts for the hand-to-hand buys charged in Counts 110-115, his case likely could have been tried within two days.

Instead, the Government decided to also charge Mr. Bostick in a sweeping, multi-year conspiracy involving seven other defendants and a wide array and quantity of controlled substances, in Count 1. Many of his co-defendants had gun and obstruction counts that had nothing to do with Mr. Bostick. The Government later also indicated its plans to introduce Rule 404(b) evidence against other co-defendants dating back to 1988 – at a time when Mr. Bostick would have been four years old. With such a broad array of evidence literally spanning the decades, the Government estimated that its case would need some 3-4 months to try, and the attendant scheduling difficulties that naturally ensued led this case to drag for almost two years.

The Government did not have to charge Mr. Bostick in this conspiracy. Indeed, we now know that the lead defendants in this case – Cinquan Blakney and Ralph Ingram – were given plea deals that were "wired" separately from Mr. Bostick. But the Government knew it could gain significant strategic advantages by charging Mr. Bostick as part of this broad conspiracy. It hoped to seat him beside far larger players in a joint trial. And more importantly, it was able to collate enough drugs in Count 1's conspiracy charge to confront Mr. Bostick with the risk of a 10-year mandatory minimum sentence – a minimum that was then doubled to 20 years after the Government filed a notice of enhancement under 21 U.S.C. § 851. No minimums would have been possible if Mr. Bostick had simply been charged with the videotaped transactions alone.

These strategic advantages, however, came with a corresponding obligation – to ensure compliance with the law's speedy trial requirements, notwithstanding the added complexity the Government had infused into Mr. Bostick's case. That obligation has not been satisfied here.

Mr. Bostick, who appears to have been a juvenile at the time when Count 1's amorphous conspiracy allegedly began, and whose only substantive counts over its entire four-plus year duration involved a grand total of $400 in drugs sold over a period of five days in October 2005, is entitled to a dismissal of this superseding indictment.

## ARGUMENT AND CITATION OF AUTHORITIES

### A. Dismissal Appears Warranted Under the Interstate Agreement on Detainers Act

The United States and the District of Columbia each are parties to the Interstate Agreement on Detainers Act (IADA). See 18 U.S.C. App. 2, Pub. L. 91-538 (1970); D.C. Code § 24-701. As the D.C. Circuit noted in *Goode v. Markley*, 603 F.2d 973, 977 (D.C. Cir. 1979), "Article II of that agreement includes the District of Columbia (and, for that matter, the United States) within the definition of 'state'"; the D.C. Circuit "assum[ed] that the District of Columbia is a separate sovereign for this purpose." Because Mr. Bostick was serving a D.C. Superior Court sentence at the time he was arraigned on the superseding indictment in the instant case, the District of Columbia would fit the definition of a "Sending State" under Article II(b) and the United States would be a "Receiving State" under Article II(c) of the IADA.[1]

There is no doubt that the United States can represent a "Receiving State" for purposes of the IADA. *See* IADA Article IX. *See also United States v. Mauro*, 436 U.S. 340, 361-62 (1978) ("Once the Federal Government lodges a detainer against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the United States must comply with

---

[1] Although characterized as an "Interstate" Agreement on Detainers, the IADA is in reality an "interjurisdictional" agreement on detainers, since the Agreement contains no express requirement that a prisoner must cross state lines in order for the IADA's provisions to apply.

its provisions."); *id.* at 356 ("There is no reason to assume that Congress was any less concerned about the effects of federal detainers filed against state prisoners than it was about state detainers filed against federal prisoners."). The IADA "requires that the disposition be speedy and that it be obtained before the prisoner is returned to the sending State. The fact that the prisoner is brought before the district court by means of a writ of habeas corpus ad prosequendum in no way reduces the need for this prompt disposition of the charges underlying the detainer." *Id.* at 362.

In the instant case, Mr. Bostick requests that all pertinent documents relating to this issue be provided to him as discovery. *See* Defendant Bostick's Motion for Pretrial Discovery (Docket #166) (requesting all documents material to the defense). Even without a copy of these documents, however, Mr. Bostick believes the federal government's lodging of a detainer against him is apparent, since he was not released at the end of his D.C. sentence, but instead was turned over to federal custody automatically, without any new hearing (and held under the bond conditions previously set in the instant case). *Cf. Mauro,* 436 U.S. at 358 (distinguishing a writ of habeas corpus ad prosequendum, which requires the immediate presence of a prisoner and does not by itself trigger the IADA, from a situation involving a detainer, the lodging of which puts the institution where he is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release). As the Supreme Court made clear in *Mauro,* if a writ of habeas corpus ad prosequendum is issued after a detainer is lodged, the IADA still applies and its provisions must be followed. *See id.* (rejecting Government's claim that a writ of habeas corpus ad prosequendum is not a written request for temporary custody under the IADA: "the Court of Appeals correctly reversed … and ordered that the indictment against Ford be dismissed").

If the Government can definitively establish that no federal detainer was ever lodged against Mr. Bostick, the IADA would not apply. *See Mauro*. But Mr. Bostick believes that the

documentation is likely to establish that the superseding indictment was lodged as a detainer against him when it was filed on August 23, 2006, and that he was writted in for his arraignment shortly thereafter, on August 30, 2006. Under such circumstances, the IADA would have been violated under Article IV(c), when the United States failed to try him within 120 days, and under Article IV(e), when it returned Mr. Bostick to D.C. custody to complete his D.C. sentence.

Unlike the Speedy Trial Act, the IADA contains no express provision for excludable time that might extend this 120-day limit. Extensions are to be granted only "for good cause shown in open court," with "the prisoner or his counsel being present." The Government did not request or obtain any hearing for a continuance of the IADA's deadlines in this case, and dismissal is warranted. *See Mauro*, at 356 n.24 (Speedy Trial Act's obligations are not inconsistent "with the United States' [IADA] status as a receiving State. In situations in which two different sets of time limitations are prescribed, the more stringent limitation may simply be applied.").

As discussed at oral argument, if the IADA has been violated, dismissal is mandatory – regardless of whether any negative impact is shown on Mr. Bostick's participation in prison programs. In *Alabama v. Bozeman*, 533 U.S. 146 (2001), the Supreme Court addressed this issue directly. There, the Court was faced with an IADA violation in Alabama, which had returned a defendant to federal prison in Florida after his initial appearance on an Alabama state criminal charge, thus violating IADA Article IV(e). The State of Alabama argued that any disruptive effect caused by his one-day appearance in Alabama had been, at most, "technical," "harmless" and "de minimus." It also claimed that returning the prisoner to his federal facility where he had established programs had actually been designed to help, not harm, his rehabilitation. The Court rejected this view, previously espoused in some circuits, that IADA's literal language could be ignored if an inmate's rehabilitation had not been interrupted. The defendant had not waived his

IADA rights, and since "a violation of Article IV(e) as literally interpreted" was conceded, "[g]iven the Agreement's absolute language," this was enough for dismissal.

In the instant case, this IADA issue is specific to Mr. Bostick – and would not apply to any of his co-defendants. But it justifies a dismissal of the superseding indictment *against him*.

**B.  Dismissal is Warranted Under the Speedy Trial Act**

As noted at oral argument, it also appears that more than 70 days of non-excludable time have elapsed since the superseding indictment was filed in this case. Because the Government has not identified sufficient exclusions of time to establish otherwise, dismissal is required.

As of today, 623 days (1 year, 8 months and 14 days) have passed since the superseding indictment was filed. So the question is, can the Government establish 553 excludable days?

Based on the docket in this case, the following dates appear to be the most pertinent:

| | |
|---|---|
| **8/23/06** | **Superseding Indictment is filed (original indictment filed on 1/26/06)** |
| **8/30/06** | **Defendant Bostick's initial appearance (he has been in custody since)** |
| **11/17/06** | **The last co-defendant (Tristan Sellers) makes an initial appearance** |
| | |
| **12/21/06** | **Court declares 180 days of excludable time under Speedy Trial Act** |
| **4/27/07** | **Court schedules trial for 3/11/08** |
| **6/19/07** | **180 days after 12/21/06 expires** |
| | |
| **9/20/07** | **Certain co-defendants start filing pretrial motions** |
| **2/29/08** | **Trial is rescheduled to begin on 2/9/09** |
| **5/7/08** | **Today** |

As noted at the hearing, some of this time is possibly excludable:

- From 8/23/06 through 11/17/06, the time is likely excludable based on the unavailability of a defendant under 18 U.S.C. § 3161(h)(3), yielding 86 excludable days;

- If the Court's Order of 12/21/06 was sufficient under 18 U.S.C. § 3161(h)(8)(A),[2] then 180 additional days would be excludable; and

- Beginning 9/20/07, certain co-defendants started filing a series of pretrial motions which, depending on their disposition, theoretically might eventually yield as many as 230 additional days of excludable time under 18 U.S.C. § 3161(h)(1)(F), as of today's date.[3]

Even with these exclusions, however, the Government would establish at most only 496 excludable days, well short of the 553 it needs. Or, looking at it the other way, between 11/17/06 and 12/21/06, there appear to be 34 non-excludable days. Between 6/19/07 and 9/20/07, there appear to be another 93 non-excludable days. These sums total 127 non-excludable days – far beyond the 70-day maximum that the Speedy Trial Act allows.

The Government's initial opposition brief (Docket # 157) appeared to be rather dismissive of the large delays in this case, stating the following at page 3:

> starting in June of 2007, defendants, including defendant Ingram, filed a series of motions, which the Court has scheduled to resolve in September of 2008.

But a review of the docket shows otherwise. The co-defendants' series of pretrial motions that are scheduled for resolution later this year actually started on September 20, 2007, not in June of 2007. And during the 93-day window in between, the Speedy Trial Act's non-excludable clock

---

[2] Mr. Bostick submits, and certain recent cases confirm, that this Order entered was likely insufficient to provide an adequate basis for excludable time. *See, e.g., Zedner v. United States*, 547 U.S. 489 (2006); *United States v. Bryant*, --- F.3d ---, No. 06-3129 (D.C. Cir., filed April 25, 2008) (generic finding that ends of justice outweighs speedy trial interests is insufficient; § 3161(h)(8)(A) requires on-the-record findings that specify in detail factors considered).

[3] Mr. Bostick does not concede that all of these days are excludable. No hearings have been held on any of these motions, the Government completed and filed all responses on February 11, 2008, and Mr. Bostick has sought a severance from his co-defendants (and disowned his co-defendants' requests for hearings). No disposition of any such motions has yet occurred, and Mr. Bostick submits that not all of these 230 days will ultimately be excludable.

resumed, and ultimately went far past the overall 70-day limit.  In sum, the Government's brief is
flatly mistaken, and the 57 extra days it needs to exclude to avoid dismissal are not apparent.[4]

At oral argument, the Government tried to suggest that its Motion(s) for Admission of
Rule 404(b) Evidence, filed against defendants Cinquan Blakney and Ralph Ingram back in
2006, might somehow allow over two years of time since then to all be deemed excludable.

A similar argument was rejected a few weeks ago, in *United States v. Bryant*, --- F.3d ---,
No. 06-3129 (D.C. Cir., filed April 25, 2008).  There, the D.C. Circuit made clear that even if a
government pleading of this type might qualify as a genuine "motion" for purposes of 18 U.S.C.
§ 3161(h)(1)(F),[5] the bottom line is that "it would not have tolled the S[peedy] T[rial] A[ct] for
as long as the Government claims."  Because no hearing was held on the motion there, it "toll[ed]
the speedy trial clock only for 'delay reasonably attributable to any period, not to exceed thirty
days, during which any proceeding concerning the defendant is actually under advisement by the
court.'"  In *Bryant*, no response had been filed to the motion by October 28, 2005.  "[T]his meant
that the trial judge could toll the speedy trial clock only for an additional 30 days while deciding

---

[4] While a few possible extra excludable days might be squeezed from other motions in the docket, they still add up
to less than the 57 days the Government needs to avoid a dismissal.  While Defendant Bostick does not concede
that all of these represent qualifying "motions" under 18 U.S.C. § 3161(h)(1)(F), the Government might point to the
following docket entries since the superseding indictment was filed in this case:  (1) Defendant Morgan's counsel's
motion to withdraw as counsel (filed 11/27/06; Docket #48); granted 12/5/06 and docketed 12/8/08 (Docket #50)
– yielding at most 8-11 excludable days; (2) The Government's emergency motion appealing bond for Defendant
Morgan, filed on 12/20/06 (Docket #52) and granted the next day (Docket #56) – yielding at most 1 extra
excludable day; (3) Defendant Blakney's motion for access to the D.C. Jail's library – no hearing held or disposition
entered (0 excludable days); and (4) Defendant Ingram's counsel's motion for interim payments, filed 5/14/07
(Docket #70) and granted 5/18/07 (Docket #72) – yielding at most 4 excludable days.  The Government might also
claim as many as 28 days of excludable time in June 2007, since two motions were filed and resolved during that
period of time (Sean Blakney's Motion for Bond, Docket #73, filed 6/1/07 and resolved 6/26/07; and Sean
Blakney's motion for interim payments for his investigator, filed 6/13/07, Docket #74 and resolved 6/28/07,
Docket #77).  The total from these motions, even giving the Government all benefits of the doubt, would be 11 + 1
+ 0 + 4 + 28 = 44, still far short of the 57 additional excludable days needed to avoid a Speedy Trial Act dismissal.

[5] Mr. Bostick submits that these pleadings, although styled as "motions," are in reality mere notices that do not
represent qualifying motions for purposes of the excludable time tolling provision in 18 U.S.C. § 3161(h)(1)(F).  *See*
*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007).

8

the motion. As of November 27, 2005, … time began accruing on the speedy trial clock again."

Just as importantly, the D.C. Circuit cautioned against any notion that Government motions

could circumvent the Speedy Trial Act's requirements by filing motions and then just waiting

around indefinitely for a decision: "Allowing the District Court to exclude the time from

November 27, 2005 until February 16, 2006 would defeat the purpose of the S[peedy] T[rial]

A[ct].… The time between November 27, 2005 and February 16, 2006 cannot be excluded."

    In the instant case, the Government filed its similar "motions" only on the original

indictment – none were filed on the superseding indictment. Even if the Government had refiled

them on the superseding indictment – which it never did – all the relief sought in those motions

has since become moot, since both Cinquan Blakney and Ralph Ingram have entered guilty

pleas. These motions were never resolved, and now there is no need to resolve them. Thus, they

cannot establish any excludable time under the Speedy Trial Act. *See United States v. Mentz*,

840 F.2d 315 (6th Cir. 1988) ("Because the district court never held a hearing or ruled on the

motion, and there is no other indication that the motion was 'actually under advisement' [as §

3161(h)(1)(F) requires], the motion did not trigger the statutory exclusions for delay occasioned

by the filing of a pretrial motion."). *Cf. United States v. Harris*, 491 F.3d 440, 445 (D.C. Cir.

2007) (citing *Mentz* with approval but finding motion "under advisement" and time excludable,

since district judge had convened a hearing and "expressly stated his intention to rule on it").

    Even if these motions had been filed on the superseding indictment and even if

dispositions had been entered or expressly reserved on these 404(b) motions, they could provide

at most a few additional days of excludable time – not enough to avoid a Speedy Trial Act

violation here. The first 404(b) motions were filed by the Government over two years ago, on

February 23, 2006 (Docket #s 11-12). Responses were filed by Ralph Ingram on April 28, 2006

(Docket #22), and by Cinquan Blakney on June 12, 2006 (Docket #25), meaning that, under *Bryant*, the speedy trial clock would have had to start running again no later than 30 days thereafter – on July 12, 2006. Twelve days thereafter, on July 24, 2006, the Government amended these motions by filing "Supplemental" motions for 404(b) Evidence as to Blakney and Ingram (Docket #s 26-27). Under LCrR 47, any opposition was due within 11 days thereafter (by August 4, 2006), unless extended by court order. So under *Bryant*, the Speedy Trial Act clock would have had to restart again – at the very latest – no later than 30 days thereafter, on September 3, 2006 – only 11 days after the superseding indictment was filed against Mr. Bostick. An extra 11 days would not make up the Speedy Trial Act gap here.

The Government's Speedy Trial Act strategy in this case, as in *Bryant*, appears evident. Rather than helping this Court to carefully monitor the days that qualified as excludable under the Speedy Trial Act, the Government attempted a short cut – filing motions in limine years before an anticipated trial and then essentially ignoring the Speedy Trial Act[6] – in the hope that this Court's final resolution of those motions might render all time in the interim excludable. But the Government's attempted short cut has led to a dead end. The D.C. Circuit has now clarified the limits of this approach. And the Government is now left relying on motions filed on a different indictment, that this Court never even decided, and which are now moot. The lesson here is evident, and consistent with society's interest in speedy trials (regardless of the parties' interests), stressed by the Supreme Court in *Zedner*. There is no "magic bullet" the Government can file to avoid its Speedy Trial Act's obligations. The broader societal goal favoring speedy trials means that the Government should always monitor a criminal docket on the cases it files –

---

[6] The Government succeeded in obtaining one 180-day exclusion from this Court, but then apparently never asked for another. In response to the instant speedy trial motion, the Government's opposition brief mistakenly claimed the co-defendants' series of pretrial motions began in June 2006, instead of on 9/20/06, when they actually began. The Government appeared to be unaware of this three month gap – where the Speedy Trial Act violation occurred.

especially where, as here, the delays grow so lengthy that the Court expresses discomfort. In short, a Speedy Trial Act dismissal by this Court not only is required by the law, but also would have the salutary effect of reminding the Government that it must assist the court in monitoring compliance with these longstanding obligations, just as other prosecutors have done for decades.

Mr. Bostick submits that over 70 non-excludable days have passed since the filing of the superseding indictment in this case. Under 18 U.S.C. § 3162(a)(2), dismissal is mandatory. *See, e.g., Bryant* (granting relief to a defendant convicted at the end of a trial of possessing a sawed-off shotgun; D.C. Circuit noted Speedy Trial Act's "procedural strictness," and said it was "obligated to reverse appellant's conviction" since the 70-day threshold had been crossed).

The dismissal required here can be entered either with or without prejudice to the Government's ability to reprosecute.[7] In deciding which to enter under 18 U.S.C. § 3162(a)(2), this Court should consider "the seriousness of the offense, the facts and circumstances of the case which led to the dismissal, and the impact of a reprosecution on the administration of this chapter and on the administration of justice." Those factors favor a dismissal with prejudice here.

First, regardless of whether the indictment should be dismissed with prejudice against Mr. Bostick's co-defendants, it is clear that he is the defendant with the least serious charges. He is the last-named defendant, with no charges after Count 1 until the superseding indictment reaches Counts 110-115. As noted, those substantive counts involve a grand total of $400 of illegal drugs. Even if the Government's evidence is believed, Mr. Bostick was selling quantities that weighed less than a penny each, hand-to-hand in person, to the ultimate consumers. In short, Mr. Bostick was a young man at the very bottom of the drug "food chain."

---

[7] Under Article IX(1) of the Interstate Agreement on Detainers Act, this Court also has discretion to enter an IADA dismissal with or without prejudice, in a case such as this one where the United States was the receiving State.

Second, the facts and circumstances of the dismissal show that the delays in this case were not attributable to Mr. Bostick. The need for dismissal arose from the Government's original charging decision, combined with its failure to monitor the docket for this Court adequately – using a short cut designed to reduce its speedy trial responsibilities. These reasons strongly favor a sanction of dismissal with prejudice, to encourage a changed approach by the Government in future cases.

Finally, allowing a re-prosecution of Mr. Bostick would inhibit the administration of the Speedy Trial Act. If this Court declares a violation but then allows this case to simply start anew, the Government would face no real consequence, encouraging a lax attitude that speedy trial violations are never serious, since they can always be overcome. As for a re-prosecution's impact on the administration of justice, it would not be undermined by a dismissal with prejudice. Mr. Bostick already has spent a substantial period of time in pretrial confinement for his three minor drug sales, and he can never recover this time in his life that already has been lost. The amount of time he has already spent in jail is commensurate with the types of penalties often given to low-level dealers who distribute $400 worth of drugs, and a fair argument can be made that "rough justice" already has been accomplished, such that reprosecution of Mr. Bostick is not needed. Mr. Bostick was never considered one of the leading targets of this prosecution, and the administration of justice will not be seriously impaired if he is not re-prosecuted here. In sum, the 18 U.S.C. § 3162(a)(2) factors favor a dismissal of Mr. Bostick's case with prejudice.

## C. Dismissal is Also Warranted Under the Sixth Amendment

Finally, dismissal of the superseding indictment is also warranted to vindicate Mr. Bostick's Sixth Amendment rights to a speedy trial.

12

The seminal case involving constitutional speedy trial rights is *Barker v. Wingo*, 407 U.S. 514 (1972). There, the Supreme Court said that courts should apply a balancing test when deciding if the Sixth Amendment has been violated, examining at least four factors: (1) length of the delay, (2) reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant from the delay. Examining these factors, the balance favors dismissal here.

### 1. **Length of the Delay**

Because the Sixth Amendment does not establish excludable time, the relevant length for constitutional purposes is the time between the indictment and trial. Here, Mr. Bostick was indicted on the superseding indictment on August 23, 2006. As of today, the relevant length is 623 days (1 year, 8 months and 14 days). If Mr. Bostick is tried as scheduled on February 9, 2009, the length of the delay will be 901 days (2 years, 5 months, and 17 days).

For constitutional purposes, any length of time in excess of one year is considered presumptively prejudicial. *See, e.g., United States v. Brown*, 520 F.2d 1106 (D.C. Cir. 1975) (a constitutional speedy trial claim "has prima facie merit when more than a year elapses between arrest and trial"). We are now already about 70% past that threshold. This factor clearly favors a dismissal under the Sixth Amendment.

### 2. **Reasons for the Delay**

In *Barker v. Wingo*, the Supreme Court described three categories of possible reasons for speedy trial delays. One category involved deliberate Government delays designed to hamper a defense – the most egregious type. One category involved delays caused by the unavailability of Government witnesses – which would typically be justified. The third category was in the middle, involving more neutral reasons such as negligence and overcrowded courts.

13

While *Barker v. Wingo* acknowledged that a delay in this third category should be weighted less heavily than deliberate delays, it reminded courts that it should "nevertheless be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." This view was later expounded upon by the Supreme Court in *Doggett v. United States*, 505 U.S. 647 (1992). There, the Supreme Court found a speedy trial violation and ordered a dismissal even thought the delay had been caused only by negligence. While this mere negligence was admittedly less egregious than willful misconduct, *Doggett* reminded courts that "it still falls on the wrong side of the line between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun."

The reasons for the delay in this case thus also weigh in favor of a dismissal.

### 3.  **Defendant's Assertion of the Right**

The Government has long been on notice of the potential speedy trial issues in this case; Defendant Ralph Ingram filed a motion to dismiss as early as April of 2006 (Docket # 18). And while it is true that Mr. Bostick did not affirmatively assert his own separate speedy trial rights until recently, that delay should be considered in its proper context.

Until new counsel was recently appointed, Mr. Bostick had filed no pretrial motions of any kind in this case. As noted in *Barker v. Wingo*, courts should "attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client." 407 U.S. at 529. Once new counsel was appointed, Mr. Bostick promptly asserted this right – this was, in fact, the first substantive motion Mr. Bostick filed (Docket #158), submitted within a week of this Court's Order that granted his new counsel leave to file additional pretrial motions.

14

There was no knowing failure to assert this right here by Mr. Bostick that can be held against him. "A defendant has no duty to bring himself to trial," *Barker v. Wingo*, and viewed in its proper context, this factor should best be construed as neutral, favoring neither side.

### 4. Prejudice to the Defendant

Within this factor, Barker v. Wingo described three different categories of prejudice that can be caused by delay – (a) oppressive pretrial incarceration, (b) anxiety and concern to the accused, and (c) risk of impairment to the defense. All weigh in favor of dismissal here.

### a. Oppressive Pretrial Incarceration

There is no dispute that Mr. Bostick has been detained since his arraignment in this case. Part of that time he was serving a separate D.C. sentence. Once that sentence ended last year, he then continued to be held behind bars – because of this case alone. If Mr. Bostick had been tried sooner, he would likely not still be in pretrial detention. He either would have been released (if acquitted) or be serving a sentence at a facility with greater programmatic opportunities. He also could have asked (if convicted) that any sentence in this case be run concurrent with his D.C. sentence. Now, with his D.C. sentence completed, that possibility has been lost to him forever.

This form of prejudice was specifically recognized by the Supreme Court in *Smith v. Hooey*, 393 U.S. 374 (1969):

> At first blush it might appear that a man already in prison under a
> lawful sentence is hardly in a position to suffer from "undue and
> oppressive incarceration prior to trial." But the fact is that delay in
> bringing such a person to trial on a pending charge may ultimately
> result in as much oppression as is suffered by one who is jailed
> without bail upon an untried charge. First, the possibility that the
> person already in prison might receive a sentence at least partially
> concurrent with the one he is serving may be forever lost if trial of
> the pending charge is postponed. Secondly, under procedures now
> widely in practice, the duration of his present imprisonment may
> be increased, and the conditions under which he must serve his

15

> sentence greatly worsened, by the pendency of another criminal
> charge outstanding against him.

During the trial delays in the instant case, Mr. Bostick had to spend more than one year serving a

D.C. Superior Court revocation sentence, likely in harsher conditions because this other case was

hanging over his head, until he maxed out that sentence and lost any chance of concurrent time.

Mr. Bostick also has been detained, since September or December 2007 (the Government was

unsure which), solely on the instant charges. In sum, the trial delays have caused Mr. Bostick

prejudice in the form of oppressive pretrial incarceration, and this category favors dismissal.

### b. Anxiety to the Accused

This is the prejudice factor that people on bond usually must rely upon, but it also applies

to defendants such as Mr. Bostick who are incarcerated. Again, quoting from *Hooey*:

> [W]hile it might be argued that a person already in prison would be
> less likely than others to be affected by "anxiety and concern
> accompanying public accusation," there is reason to believe that an
> outstanding untried charge (of which even a convict may, of
> course, be innocent) can have fully as depressive an effect upon a
> prisoner as upon a person who is at large.... The strain of having
> to serve a sentence with the uncertain prospect of being taken into
> the custody of another state at the conclusion interferes with the
> prisoner's ability to take maximum advantage of his institutional
> opportunities.

The *Barker v. Wingo* court also confirmed this:

> The time spent in jail awaiting trial has a detrimental impact on the
> individual. It often means loss of a job; it disrupts family life; and
> it enforces idleness. Most jails offer little or no recreational or
> rehabilitative programs. The time spent in jail is simply dead time.

In sum, this prejudice category also favors dismissal.

16

### c. **Risk of Impairment to the Defense**

Finally, this category of prejudice also favors dismissal. As *Hooey* noted:

> Confined in a prison ... [a defendant's] ability to confer with
> potential defense witnesses, or even to keep track of their
> whereabouts, is obviously impaired. And while "evidence and
> witnesses disappear, memories fade, and events lose their
> perspective," a man isolated in prison is powerless to exert his own
> investigative efforts to mitigate these erosive effects of the passage
> of time.

As *Barker v. Wingo* noted, some risk of an impaired defense exists in any detention:

> [I]f a person is locked up, he is hindered in his ability to gather
> evidence, contact witnesses, or otherwise prepare his defense.
> Imposing those consequences on anyone who has not yet been
> convicted *is serious*.

Mr. Bostick cannot at this time identify specific defense witnesses who have died or gone

missing, or documents that he will be unable to locate for trial, due to delays in this case. The

defense's investigation is ongoing, and Mr. Bostick may not know until closer to trial if these

types of issues develop, or if, for example, the suspected crack cocaine has crumbled or degraded

in the Government's custody to a point at which it can no longer be validly restested. But Mr.

Bostick need not show that level of actual prejudice, as *Barker* conceded:

> Loss of memory ... is not always reflected in the record, because
> what has been forgotten can rarely be shown

This rule was also reaffirmed in the *Doggett* case, where the Supreme Court specifically

rejected any suggestion that actual impairment of the defense had to be shown before a defendant

could receive a speedy trial dismissal under the Sixth Amendment:

> [C]onsideration of prejudice is not limited to the specifically
> demonstrable.... [A]ffirmative proof of particularized prejudice is
> not essential to every speedy trial claim.... [I]mpairment of one's
> defense is the most difficult form of speedy trial prejudice to prove
> because time's erosion of exculpatory evidence and testimony can
> rarely be shown.... [W]e generally have to recognize that

excessive delay presumptively compromises the reliability of a
trial in ways that neither party can prove or, for that matter,
identify.

During oral arguments in the instant case, this Court asked whether a dismissal had ever

been granted where no actual prejudice had been established. Counsel attempted to convey that

Mr. Bostick *has* incurred identifiable *Barker v. Wingo* prejudice here – in the form of oppressive

pretrial incarceration and anxiety, among other things. Mr. Bostick's counsel also noted that

*Doggett* had made clear that prejudice in the form of actual impairment of the defense did not

need to be shown in order for a defendant to obtain a constitutional speedy trial dismissal.

This Court responded by correctly noting that *Doggett* involved an 8-year delay –

admittedly far longer than here. But the defendant in *Doggett* was also freely living in the open

world. In other words, he had no "detention" prejudice. He had no real "anxiety" prejudice,

since he apparently had been unaware of the charges that were pending against him. And he had

no prejudice of a demonstrably "impaired defense", since he had "failed to make any affirmative

showing that the delay weakened his ability to raise specific defenses, elicit specific testimony,

or produce specific items of evidence."

In short, there was no real prejudice at all that the defendant could demonstrate in

*Doggett* – yet dismissal was ordered anyway. Yes, there was an 8-year delay, but that fact only

begs the question – would you rather live freely for 8 years, blissfully unaware of the pending

charges, or face a shorter but substantial trial delay of more than one year during which time you

were continuously incarcerated? Mr. Bostick submits that the delay in his case, in light of its

prejudice to him and the other *Barker v. Wingo* factors, is at least as deserving of dismissal under

the Sixth Amendment as the situation involving mere negligence by the Government in *Doggett*.

In sum, looking at the four *Barker v. Wingo* factors – the length of the delay, the reasons

for the delay, defendants' assertion of a right, and the prejudice to Mr. Bostick – the balance

weighs in favor of the superseding indictment's dismissal.

## CONCLUSION

For the foregoing reasons, the superseding indictment should be dismissed against

defendant Donovan Bostick with prejudice.

Respectfully submitted,

_____/s/_____
Gregory S. Smith
D.C. Bar No. 472802
913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT BOSTICK'S
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS ON SPEEDY TRIAL
GROUNDS is being served upon the United States, Assistant United States Attorneys Anthony
Scarpelli and George Eliopoulos, as well as upon counsel for each of Mr. Bostick's co-
defendants, through the Electronic Case Filing system.  This 7th day of May, 2008.

_____/s/_____
Gregory S. Smith